# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**JEFF MCCOMAS, DR. BARBARA MORRIS**, M.D., and **DR. JENNIFER HARBERT**, M.D.,

Plaintiffs,

v.

**JARED POLIS**, in his official capacity as Governor of Colorado; **PHILIP J. WEISER**, in his official capacity as Colorado Attorney General; **JILL HUNSAKER RYAN**, in her official capacity as Executive Director of Colorado Department of Public Health & Environment; **PAULA E. MARTINEZ**, in her official capacity as Program Director of the Colorado Medical Board; **ALEXIS KING**, in her official capacity as the District Attorney for the 1st Judicial District; **ANNE E. KELLY**, in her official capacity as the District Attorney for the 12th Judicial District,

Defendants.

Civil Action No. 25-cv-1618

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, PURSUANT TO 42 U.S.C. § 1983**

## INTRODUCTION

1. Colorado has an established reputation as a safe haven that protects individual rights for both its own residents and residents of other states. For example, in 2023, Colorado passed legislation protecting reproductive rights and gender-affirming care for residents and non-residents in response to surrounding states' restrictions on such rights. When signing the legislation, Governor Jared Polis proudly stated that the new laws would "further Colorado's reputation as a beacon of freedom, a beacon of choice, a beacon of individuality where we live on our own terms." Saja Hindi, *Colorado Expands Protections for Abortion, Transgender Care*, THE DENVER POST (April 14, 2023), *available at* https://www.denverpost.com/2023/04/14/colorado-abortion-gender-care-protections-expanded/.

2.      Consistent with that spirit, Colorado has also been a leader in recognizing the right of mentally competent, terminally ill patients to seek medical aid in dying from their providers. In 2016, Colorado voters passed Proposition 106, "Access to Medical Aid in Dying," which amended the state statutes to include the Colorado End-of-Life Options Act, Article 48 of Title 25 (the "Act"). With the Act's enactment, Colorado became the sixth state in the country to allow qualified patients to obtain a prescription from their attending provider to ease suffering during their final stages of life and die peacefully.

3.      But access to this end-of-life care is denied to non-resident patients under Colorado law, even if these patients are present in Colorado and otherwise qualify for a prescription under the Act. This discriminatory denial violates the United States Constitution and undermines Colorado's status as a safe haven and protector of individual constitutional rights for all.

4.      Plaintiffs Jeff McComas, Dr. Barbara Morris, and Dr. Jennifer Harbert bring this action to challenge the constitutionality of the Act's residency requirements. First, the Act's narrow definition of a "qualified individual" as "a resident of the state who is a capable adult" unconstitutionally limits the Act's protection to Colorado residents. C.R.S. § 25-48-102(13)(a). Second, the Act's requirement that the terminally ill patient demonstrate Colorado residency unconstitutionally limits the Act's protection to Colorado residents. C.R.S. §§ 25-48-102(14), 25-48-106(1)(b). Third, the Act's requirement that a Colorado attending provider verify the Colorado residency of the terminally ill patient unconstitutionally limits the ability of providers to provide care under the Act and for otherwise qualified nonresidents to access this end-of-life option. C.R.S. § 25-48-106(1)(b).

5.      By using residency status to prospectively deny otherwise qualified patients, like Jeff McComas, access to medical care and providers, like Dr. Morris and Dr. Harbert, the ability

to provide that care, the Act violates the Privileges and Immunities Clause (Art. IV, § 2), the Commerce Clause (Art. I, § 8), and the Equal Protection Clause (Amend. XIV, § 2) of the United States Constitution.

6.    Plaintiffs seek declaratory and injunctive relief to prevent enforcement of the Act's unconstitutional residency requirement.

## PARTIES

7.    Plaintiff Jeff McComas is a 55-year-old retired engineer who resides in Woodbury, Minnesota. Mr. McComas has been diagnosed with Stage IV intestinal cancer. Mr. McComas's diagnosis is incurable and inoperable. Although Mr. McComas continues to undergo chemotherapy to treat his illness, his diagnosis is terminal. Ultimately, the cancer will prevent Mr. McComas's body from processing food and spread throughout Mr. McComas's body to other vital organs, increasing Mr. McComas's suffering and hastening his decline.

8.    Mr. McComas has lived a happy and meaningful life and does not want to die. Should his suffering become unbearable, however, he wishes to have the option of medical aid in dying. Because no statute authorizing medical aid in dying exists in Minnesota, Mr. McComas would like the option of accessing medical care in Colorado. But due to the Act's unconstitutional residency requirement, Mr. McComas is prohibited from accessing medical aid in dying in Colorado.

9.    Plaintiff Dr. Barbara Morris is a physician and geriatrician who lives in Golden, Colorado. Dr. Morris has provided Colorado residents with medical aid in dying pursuant to the Act, and Dr. Morris is contacted regularly by terminally ill patients, some of whom live out of state, regarding medical aid in dying. The Act's unconstitutional residency requirement limits Dr. Morris's ability to treat patients by offering the full spectrum of options because she is unable to

help patients who would like to receive medical aid in dying if they are out-of-state residents without facing potential criminal or civil liability. Therefore, the Act prevents Dr. Morris from providing one type of care she, in her professional medical judgment, deems to be appropriate to both in-state and out-of-state patients who request it, all of whom face critical end-of-life decisions. This harms her ability to engage in interstate commerce. Without the Act's residency requirement, Dr. Morris would be able to provide medical aid in dying by writing or consulting on prescriptions for qualified non-resident patients pursuant to the same medical standard of care that applies to her patients residing in Colorado—without fear of violating the law. Instead, Dr. Morris is forced to either refer such patients to another healthcare provider in another state that can qualify non-residents or wait to provide care until the patients have successfully changed their residency to Colorado. Often, the time required for patients to change their residence is too long and they ultimately die before receiving care. The disruption in care while patients try to become Colorado residents harms Dr. Morris's ability to provide patient care. Dr. Morris brings this suit on her own behalf, on behalf of patients who wish to have the option for medical aid in dying, and on behalf of prospective patients who may be denied medical aid in dying option in the future.

10.     Plaintiff Dr. Jennifer Harbert is a family physician and hospice medical director who lives in Creede, Colorado. In her work, Dr. Harbert is contacted regularly by terminally ill patients, some of whom live out of state. The Act's unconstitutional residency requirement limits Dr. Harbert's ability to treat patients by offering the full spectrum of options because she is unable to help patients who would like to receive medical aid in dying if they are out-of-state residents without facing potential criminal or civil liability. Therefore, the Act prevents Dr. Harbert from providing one type of care she, in her professional medical judgment, deems to be appropriate to both in-state and out-of-state patients who request it, all of whom face critical end-of-life decisions.

4

This harms her ability to engage in interstate commerce. Without the Act's residency requirement, Dr. Harbert would be able to provide medical aid in dying by writing or consulting on prescriptions for qualified non-resident patients pursuant to the same medical standard of care that applies to her patients residing in Colorado—without fear of violating the law. Instead, Dr. Harbert is forced to either refer such patients to another healthcare provider in another state that can qualify non-residents or wait to provide care until the patients have successfully changed their residency to Colorado. Often, the time required for patients to change their residence is too long and they ultimately die before receiving care. The disruption in care while patients try to become Colorado residents harms Dr. Harbert's ability to provide patient care. Dr. Harbert brings this suit on her own behalf, on behalf of patients who wish to have the option for medical aid in dying, and on behalf of prospective patients who may be denied medical aid in dying option in the future.

11.    Defendant Governor Jared Polis is sued in his official capacity as Governor of the State of Colorado. He is vested with the executive power of the State and is required to see that Colorado's laws—including laws related to health care—are faithfully executed. Colo. Const. Art. IV, § 2. Governor Polis is a person within the meaning of 42 U.S.C. § 1983 and is acting under color of state law at all times relevant to this complaint.

12.    Defendant Attorney General Philip J. Weiser is sued in his official capacity as Attorney General of the State of Colorado. Attorney General Weiser represents the State of Colorado in all civil and criminal matters in which the State is a party or has an interest. Attorney General Weiser also has general supervision of criminal prosecutions. Attorney General Weiser is a person within the meaning of 42 U.S.C. § 1983 and is acting under color of state law at all times relevant to this complaint.

13.     Defendant Jill Hunsaker Ryan is sued in her official capacity as Executive Director of the Colorado Department of Public Health & Environment. The Department is responsible for enforcing the laws and regulations related to health and safety. C.R.S. §§ 25-1-102, 25-1-108, 25-1.5-101. Executive Director Ryan is a person within the meaning of 42 U.S.C. § 1983 and is acting under color of state law at all times relevant to this complaint.

14.     Defendant Paula E. Martinez is sued in her official capacity as Program Director of the Colorado Medical Board. The Colorado Medical Board has the power and duty to license and certify health professionals, to investigate and hold hearings regarding complaints and charges of unprofessional conduct and illegal practice of medicine, and to refer substantiated complaints to the appropriate prosecutorial authority. C.R.S. § 12-240-101 et seq. Program Director Martinez is a person within the meaning of 42 U.S.C. § 1983 and is acting under color of state law at all times relevant to this complaint.

15.     Defendant Alexis King is sued in her official capacity as the District Attorney for the First Judicial District of Colorado. As District Attorney, Ms. King investigates and prosecutes all indictable crimes in Golden, Colorado. Ms. King is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

16.     Defendant Anne E. Kelly is sued in her official capacity as the District Attorney for the Twelfth Judicial District of Colorado. As District Attorney, Ms. Kelly investigates and prosecutes all indictable crimes in Creede, Colorado. Ms. Kelly is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

17.     Defendants, through their respective duties and obligations, are responsible for enforcing the Act. Each defendant, and those subject to their direction, supervision, and control,

have the responsibility to intentionally perform, participate in, aid and/or abet in the enforcement of the Act in some manner.

## JURISDICTION AND VENUE

18.     Plaintiffs bring this action under 42 U.S.C. § 1983 to redress the deprivation of rights secured by the United States Constitution, under color of state law.

19.     This Court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because (1) all Defendants reside within the State of Colorado and (2) a substantial part of the events giving rise to Plaintiffs' claims will occur in this District.

## FACTUAL BACKGROUND

**A.      The Act.**

7.      On December 16, 2016, the Act, otherwise known as the Colorado End-of-Life Options Act, went into effect. On this date, Colorado became the sixth state in the country to allow qualified patients to obtain a prescription from their attending provider to ease suffering during their final moments of life and die peacefully. But access to this end-of-life care is denied to non-resident patients under Colorado law, even if these patients are present in Colorado and otherwise qualify for a prescription under the Act.

8.      The Act defines "qualified individual" as "a resident of the state who is a capable adult and who has satisfied the requirements of this article 48 in order to obtain a prescription for medication to bring about a death." C.R.S. § 25-48-102(13)(a).

9.     The Act further defines "[r]esident" to mean "an individual who is able to demonstrate residency in Colorado by providing any of the following documentation to his or her attending provider: (a) A Colorado driver's license or identification card issued pursuant to article 2 of title 42, C.R.S.; (b) A Colorado voter registration card or other documentation showing the individual is registered to vote in Colorado; (c) Evidence that the individual owns or leases property in Colorado; or (d) A Colorado income tax return for the most recent tax year." C.R.S. § 25-48-102(14).

10.     The Act requires that the attending provider verify that the terminally ill patient has demonstrated Colorado residency through one of the methods set forth in C.R.S. § 25-48-102(14). C.R.S. § 25-48-106(1)(b). Nothing in the Act requires a qualified individual to self-ingest the aid-in-dying medication in Colorado.

11.     The Act does not preclude criminal penalties for conduct that is inconsistent with the Act's provisions: "The penalties specified in this article do not preclude criminal penalties applicable under the 'Colorado Criminal Code', title 18, C.R.S., for conduct that is inconsistent with this article." C.R.S. § 25-48-119(4).

**B.     Jeff McComas.**

12.     Mr. McComas is a fully competent 55-year-old retired engineer and a resident of Woodbury, Minnesota, a suburb of St. Paul. He has lived nearly all of his life in Minnesota, though he has frequently traveled to other states, including Colorado. Mr. McComas is married and has two children, ages 18 and 22. Mr. McComas is one of seven children and has a large, close-knit extended family based in Minnesota. He spent most of his career working as an engineer but also worked part-time for his wife's mobile veterinary practice. Mr. McComas is now retired and enjoys spending time with his family and playing pickleball.

13.     Mr. McComas was diagnosed with Stage IV intestinal cancer in January 2023. His original prognosis was January 2024—one year from diagnosis. But he immediately started taking chemotherapy and his prognosis was extended. Mr. McComas's current prognosis is May 2026.

14.     Mr. McComas's battle with cancer has been difficult. He experiences a persistent pain in his gut and ingesting certain foods or drinks can cause intense pain. Mr. McComas suffers from significant intestinal issues, including digestive problems, lesions, constipation, and hemorrhoids. During a surgery in June 2024, doctors removed four feet of Mr. McComas's intestine to relieve blockages.

15.     Chemotherapy, while prolonging Mr. McComas's life, causes further pain and suffering. Following chemotherapy treatment, which Mr. McComas takes every two weeks, Mr. McComas suffers from nausea, loss of appetite, "brain fog," and fatigue, all of which can cause Mr. McComas to remain bedridden for periods of time. Based on discussions with his doctor, Mr. McComas expects there will come a time when he can no longer endure chemotherapy. Even if Mr. McComas continued chemotherapy treatment indefinitely, it will not cure him. Mr. McComas knows the cancer will end his life.

16.     Mr. McComas has a wonderful life and does not want to die. He has a positive spirit, owing in large part to the love and support of his family and friends who surround him. But he understands that his time left to live is limited. It is important to Mr. McComas that he maintain control of his medical decisions during the entire course of his end-of-life treatment, which includes medical decisions surrounding his death. Mr. McComas wants to direct and control his end-of-life care so that he can die peacefully surrounded by his family.

17.     Mr. McComas has long been a proponent of medical aid in dying. Mr. McComas believes that individuals should have the option to decide the time and place of their death. After

he was diagnosed with Stage IV cancer, this lack of access to medical aid in dying became a reality for Mr. McComas, as he was forced to quickly make end-of-life arrangements.

18.     According to his medical providers, Mr. McComas's cancer will ultimately spread to other organs and weaken his peritoneum, which protects his intestinal organs. Due to complications from the cancer, Mr. McComas will eventually be unable to process food and liquids, causing significant pain. Instead of suffering such an unbearable decline, Mr. McComas wishes to have the option to use medical aid in dying to secure a peaceful death in a comfortable place with his family.

19.     Mr. McComas feels well-cared for by his oncologists and palliative care team. Even so, he knows there may come a time when even the best doctors and treatments cannot relieve his end-of-life suffering. If that time comes, Mr. McComas would like the option of medical aid in dying.

20.     Further, Mr. McComas believes that merely knowing that he has the option of medical aid in dying will provide a palliative effect. It will reduce his anxiety by providing him with peace of mind to know that he will not have to suffer needlessly, even if he ultimately never ingests the prescription.

21.     Mr. McComas wishes to receive medical aid in dying in Colorado. Colorado is the closest state within a feasible driving distance of Mr. McComas that authorizes medical aid in dying. Mr. McComas has enjoyed traveling to Colorado multiple times throughout his life, and Colorado reminds Mr. McComas of his home state of Minnesota. Due to health limitations, Mr. McComas generally avoids air travel, limiting his options to visit other states. He has not traveled on a plane since his intestinal surgery in June 2024 due to health concerns. As his health deteriorates, his ability to travel by air will be further limited.

22.    Mr. McComas is over 18 years old, capable of making an informed decision, and is under the care of a physician for a terminal illness. *See* C.R.S. § 25-48-102(13)(a). The only restriction preventing Mr. McComas from accessing the medical care that he desires—were his prognosis to worsen—is the Act's unconstitutional residence requirement. *See id.*

23.    Given his current prognosis, Mr. McComas is at the point in his life where he would like to start making end-of-life arrangements now, including finding a supportive provider in Colorado. But the unconstitutional residency requirement in the statute precludes him from taking those steps, and the Act is thereby causing him needless stress and uncertainty. Mr. McComas would like the option of accessing medical aid in dying at the point when his prognosis becomes six months or fewer left to live. Mr. McComas does not want to—and, indeed, cannot—wait to start this legal process only after such an unfortunate eventuality and, as a consequence of such delay, thereby lose any hope of timely accessing his desired end-of-life care. Therefore, he brings the case now in hopes of achieving a timely resolution of this critical constitutional issue while he still can. If medical aid in dying were available to non-Colorado residents, Mr. McComas would promptly exercise the option of finding a Colorado-based provider who would support him through the process of evaluating and qualifying him for this end-of-life option.

## C.    Dr. Morris.

24.    Plaintiff Dr. Barbara Morris has over four decades of clinical experience. She has served as a medical director for Centura Health Medical Group and Erickson Health Medical Group in Colorado. Dr. Morris has also been employed as a geriatrician for Stride Community Health Center, Centura Health Medical Group, Erickson Health Medical Group, and Colorado Permanente Medical Group. Dr. Morris currently runs her own practice for geriatric advocacy and

consulting. She also serves as President of End of Life Options Colorado. Dr. Morris is licensed to practice medicine in Colorado, but not in any other jurisdiction.

25.     Separately, Dr. Morris has provided Colorado residents with medical aid in dying, pursuant to the Act. After Proposition 106 passed in 2016, but before the Act went into effect, patients were already expressing their desire to discuss medical aid in dying with Dr. Morris. Since the Act went into effect, she has provided medical aid-in-dying support to numerous patients in Colorado.

26.     Dr. Morris co-founded the non-profit organization, End of Life Options Colorado, to educate the public and the medical community about medical aid in dying, to mentor providers seeking to participate as prescribers, and to help patients find care. She also educates healthcare teams and evaluates, qualifies, and prescribes medication to patients under the Act. Dr. Morris has educated both lay people and healthcare providers around Colorado about the Act. She has also given several presentations about end-of-life suffering and medical aid in dying to health networks across Colorado.

27.     Due to her expertise, Dr. Morris regularly fields inquiries from other providers about medical aid in dying. In this capacity, Dr. Morris assists with questions about eligibility and helps to navigate clinical practice. Dr. Morris also regularly advises providers on the use of medical aid in dying. On average, Dr. Morris fields questions about the practice of medical aid in dying from healthcare providers for approximately 10 cases a month.

28.     Dr. Morris has also received many inquiries about end-of-life care from terminally ill individuals, including individuals from outside Colorado. While Dr. Morris can provide all other forms of end-of-life care for these individuals, she cannot work to qualify these individuals for an aid-in-dying prescription without proof of their Colorado residency.

29.    The Act's unconstitutional residency requirement limits Dr. Morris's ability to help patients who would like to receive medical aid in dying because she cannot qualify or write a prescription for out-of-state residents without facing potential criminal or civil liability. Therefore, the Act prevents Dr. Morris from providing one type of care that she, in her professional medical judgment, deems to be appropriate to both in-state and out-of-state patients who request it, all of whom face critical end-of-life decisions. This harms her ability to engage in interstate commerce. Without the Act's residency requirement, Dr. Morris would be able to provide medical aid in dying by writing or consulting on prescriptions for qualified non-resident patients pursuant to the same medical standard of care that applies to her patients residing in Colorado—without fear of violating the law.

30.    In the past, Dr. Morris has been the attending provider for a number of patients who have opted to go through the qualification process and ultimately fill a prescription for medication under the Act. In addition, she has been the attending provider for several other patients who were considering medical aid in dying, but for various reasons never received a prescription. More recently, Dr. Morris has served as the consulting provider for patients who would like to receive a prescription pursuant to the Act.

31.    The Act requires that Dr. Morris—whether she is the attending provider or the consulting provider—confirm that a patient seeking medical aid in dying is a Colorado resident. C.R.S. § 25-48-106(1)(b).

32.    Due to the Act's unconstitutional residency requirement, Dr. Morris is unable to qualify non-Colorado residents for medical aid in dying, denying them otherwise appropriate medical care solely due to their residency status. However, if these patients had been residents of Colorado, Dr. Morris would have treated them as she does any other resident patient.

33.     The Act bars Dr. Morris from providing medical aid in dying to non-resident patients who would otherwise be eligible to receive that care. Medical aid in dying is the only medical care option in Dr. Morris's practice for which a patient's lack of Colorado residency categorically denies the otherwise appropriate care that she can provide.

34.     Dr. Morris's inability to offer medical aid in dying to non-Colorado residents interferes with her ability to engage in interstate commerce because it limits the number of patients she can treat and forces her to decline to treat prospective non-Colorado resident who seek medical aid in dying.

35.     The Act's residency requirement also violates Dr. Morris's non-Colorado resident patients' constitutional rights.

**D.     Dr. Harbert.**

36.     Dr. Harbert has been practicing medicine for over 25 years. During her extensive medical career, Dr. Harbert has specialized in emergency medicine and family medicine in multiple hospitals around the world, though most of her time has been spent providing clinical care to the underserved community in Creede and the San Luis Valley. Dr. Harbert is licensed to practice medicine in Colorado, but not in any other jurisdiction.

37.     Dr. Harbert currently serves as the Director for a hospice in Alamosa, Colorado, where she provides palliative and hospice care for terminally ill patients from across the San Luis Valley. The mission of that hospice is to create a peaceful transition for clients with life-limiting illnesses and assist clients and families in the celebration of life with love, caring, and dignity. Dr. Harbert also works as a provider for Rio Grande Hospital in Creede, Colorado.

38.     Dr. Harbert's practice is dedicated to providing end-of-life care for patients and families living with serious and terminal illnesses by counseling them on their options and by

evaluating and qualifying them for and, where appropriate, providing them a prescription under the Act. Through her practice, Dr. Harbert has cared for hundreds of terminally ill patients.

39.    It is typical for Dr. Harbert to provide hospice consultative services for 10-15 patients receiving end-of-life care at any point. This care generally includes certifying patient terminality, reviewing options for end-of-life care, evaluating and qualifying patients for care, and, when appropriate, providing a prescription under the Act. To be an effective clinician, Dr. Harbert must establish trusting relationships with patients, families, and providers at a medically complex and highly emotional time.

40.    Dr. Harbert has performed approximately 25-30 medical aid in dying consultations since the Act was passed in 2016.

41.    Many non-Colorado residents visit Creede and the San Luis Valley, particularly in the summer, but do not stay in Colorado long enough to establish residency. These non-resident visitors occasionally seek out medical care or hospice care from Dr. Harbert and the hospice she oversees. Despite the likelihood that these individuals may be otherwise eligible for medical aid in dying, Dr. Harbert cannot even consider these requests based only on the prospective patients' residency.

42.    Dr. Harbert's inability to offer medical aid in dying to non-Colorado residents interferes with her ability to engage in interstate commerce because it limits the number of patients that she can treat and forces her to decline to treat non-Colorado resident patients who seek medical aid in dying.

## FIRST CAUSE OF ACTION

### (The Act Violates the U.S. Constitution's Privileges and Immunities Clause)

43.    Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs, as if fully set forth herein.

44.    Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief.

45.    The Privileges and Immunities Clause in Article IV of the United States Constitution provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art IV, § 2.

46.    Thus, there are explicit protections for citizens of one state who travel in another state. These protections allow the visitor to enjoy the "Privileges and Immunities of Citizens in the several States" that they visit. As such, the Privileges and Immunities Clause prohibits differential treatment of in-state and out-of-state residents that infringes on the fundamental right to travel.

47.    The Privileges and Immunities Clause and 42 U.S.C. § 1983 prohibit state officials from restricting non-resident visitors' access to medical care within its borders absent a substantial state interest and restrictions narrowly tailored to those interests.

48.    The Act's definition of "qualified individual" and residency requirement violate the Privileges and Immunities Clause by limiting the availability of medical aid in dying to residents of Colorado. Specifically, Mr. McComas is injured by his inability to access medical aid in dying based solely on his Minnesota residency. Minnesota does not offer medical aid in dying, so he will not be able to access this care even though an otherwise similarly situated Colorado resident could access the care. Drs. Morris's and Harbert's non-Colorado resident patients are also injured by their inability to pursue medical aid in dying solely due to the Act's residency restriction.

16

49.     The Act creates an invidious classification that impinges on the right to interstate travel by denying non-residents access to Colorado's medical care.

50.     The Act constitutes a failure to accord residents and non-residents, including Mr. McComas and patients of Dr. Morris and Dr. Harbert, equal treatment.

51.     The Act restricts out-of-state residents' ability to access medical services.

52.     The Act's definition of "qualified individual" and residency requirement inhibit the ability of Mr. McComas, and Drs. Morris's and Harbert's non-Colorado resident patients, to receive medical care in Colorado.

53.     The differential treatment between resident and non-resident patients established by the Act is not necessary to achieve any substantial state interest.

54.     The differential treatment between resident and non-resident patients established by the Act is not necessary to achieve any legitimate state interest.

55.     Plaintiffs are entitled to a declaration that the Act's residency requirement violates the Privileges and Immunities Clause on its face and as applied and is therefore unconstitutional.

56.     Plaintiffs are entitled to a permanent injunction enjoining Defendants from enforcing the Act's residency requirement.

### SECOND CAUSE OF ACTION
**(The Act Violates the U.S. Constitution's Dormant Commerce Clause)**

57.     Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs, as if fully set forth herein.

58.     Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief.

59.    The Commerce Clause of Article I, Section 8, of the U.S. Constitution and 42 U.S.C. § 1983 bar state officials from enacting laws that discriminate against interstate commerce.

60.    The Act has a substantial effect on interstate commerce in the form of medical care. The Act prevents Mr. McComas from receiving specific medical care after crossing state lines into Colorado, even though he would otherwise qualify for this care. The Act discriminates against Mr. McComas by preventing him from engaging in interstate commerce by restricting access to the purchase of medical care, solely on the basis of his residency.

61.    The Act also prevents Dr. Morris and Dr. Harbert from providing specific medical services to existing patients crossing state lines from other states to Colorado. The Act prevents Dr. Morris and Dr. Harbert from offering consultations to prospective out-of-state patients who would otherwise procure their services were Dr. Morris and Dr. Harbert permitted to assist these patients with medical aid in dying. Further, the Act violates the Dormant Commerce Clause because it prevents patients who reside in other states from procuring services in Colorado from Drs. Morris and Harbert, solely based on their residency.

62.    The Act discriminates against interstate commerce on its face. By its terms, the Act distinguishes between Colorado residents and out-of-state residents. In doing so, the Act restricts an out-of-state resident's ability to access Colorado medical care. In the same manner, the Act restricts a provider in Colorado from providing out-of-state residents with access to medical care afforded to otherwise identical Colorado residents.

63.    Alternatively, the Act substantially burdens interstate commerce by discouraging non-residents from traveling to Colorado. In the same manner, the Act also substantially burdens interstate commerce by discouraging providers practicing in Colorado from attending to patients

who do not meet the requirements of Colorado residency. That burden exceeds the benefits, if any, provided by the Act's residency requirement.

64.    Plaintiffs are entitled to a declaration that the Act's residency requirement violates the Dormant Commerce Clause on its face and as applied and is therefore unconstitutional.

65.    Plaintiffs are entitled to a permanent injunction enjoining Defendants from enforcing the Act's residency requirement.

## THIRD CAUSE OF ACTION
### (The Act Violates the U.S. Constitution's Equal Protection Clause)

66.    Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs, as if fully set forth herein.

67.    Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief.

68.    The Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983 mandate that state and local government officials treat all similarly situated persons alike and broadly restricts invidious discrimination of individuals based on membership in a class, absent a legitimate state interest.

69.    The Act's definition of "qualified individual" and residency requirement violate the Equal Protection Clause because the provisions invidiously discriminate against non-residents of Colorado without a legitimate state interest. Specifically, because they are members of a class of non-Colorado residents, Mr. McComas and Drs. Morris's and Harbert's non-Colorado resident patients are injured by their inability to access medical aid in dying. They are discriminated against by the State of Colorado, based solely on their lack of residency status. Mr. McComas's home state of Minnesota has not authorized medical aid in dying, so Mr. McComas will not be able to

access this care—in Minnesota or Colorado—even though a similarly situated Colorado resident would be able to access the exact same care.

70.     The Act results in invidious discrimination against a class of non-Colorado residents that impinges on the right to interstate travel, a fundamental right.

71.     Alternatively, even if not a fundamental right, the Act results in invidious discrimination against a class of non-Colorado residents that impinges on a benefit conferred upon similarly situated Colorado residents. The Act also restricts out-of-state residents' ability to access medical services.

72.     The Act constitutes a failure to accord residents and non-residents equal protection under federal law. Specifically, the Act denies Mr. McComas and Drs. Morris's and Harbert's non-Colorado resident patients the ability to access end-of-life care in Colorado even though identically situated Colorado residents may access exactly this care.

73.     The differential treatment between resident and non-resident patients, established by the Act, is not necessary to achieve any legitimate state interest.

74.     Plaintiffs are entitled to a declaration that the Act's residency requirement violates the Constitution's Equal Protection Clause and is therefore unconstitutional.

75.     Plaintiffs are entitled to a permanent injunction enjoining Defendants from enforcing the Act's residency requirement.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request the following relief:

1.  On Plaintiffs' First, Second, and Third Causes of Action as follows:

    a.  For declaratory and injunctive relief as follows:

    i.  a declaration that the Act's definition of "qualified individual" and residency requirement violate the Privileges and Immunities Clause of Article IV, § 2 of the United States Constitution;

    ii.  a declaration that the Act's definition of "qualified individual" and residency requirement violate the Commerce Clause of Article I, Section 8 of the United States Constitution;

    iii.  a declaration that the Act's definition of "qualified individual" and residency requirement violate the Equal Protection Clause of the United States Constitution;

    iv.  a declaration that each statutory and regulatory provision complained herein violates the Privileges and Immunities Clause, the Dormant Commerce Clause, and the Equal Protection Clause of the United States Constitution; and an order permanently enjoining Defendants from enforcing the Act's residency requirement;

  b.  For an award of Plaintiffs' reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

2.  All such further relief as the Court may deem equitable and proper.

Dated:  May 22, 2025                    Respectfully submitted,


                                        */s/ Elizabeth A. Och*
                                        Michael C. Theis (#17079)
                                        Elizabeth A. Och (#47566)
                                        David A. Willner (#55824)
                                        Steve Bruns (#58248)
                                        HOGAN LOVELLS US LLP
                                        1601 Wewatta St., Ste. 900
                                        Denver, CO 80202
                                        Tel: (303) 899-7300
                                        Fax: (303) 899-7333
                                        michael.theis@hoganlovells.com
                                        elizabeth.och@hoganlovells.com
                                        david.willner@hoganlovells.com
                                        steve.bruns@hoganlovells.com

                                        Jess Pezley (#2684924)
                                        Veronica Darling (#2689221)
                                        COMPASSION & CHOICES
                                        8156 S Wadsworth Blvd #E-162
                                        Littleton, CO 80128
                                        Tel: (800) 247-7421
                                        jpezley@compassionandchoices.org
                                        vdarling@compassionandchoices.org

                                        *Counsel for Plaintiffs*